Okay, the next case of the morning is number 19-10874, Harrison v. Phillips. And we'll wait until everything settles down. Mr. Pettit. Thank you, Judge Jones, and may it please the Court. Federal law affords Texas broad discretion to pursue its health care policies both inside and outside of the Medicaid system. The district court erred when it ignored that discretion and ordered Texas to fund Barbara Harrison's preferred care through its general revenues while it created an entirely new administrative process. For the reasons we discussed in our brief, Ms. Harrison's claims should have been dismissed for lack of jurisdiction or on the basis of equitable abstention. But our arguments about why her claims for a preliminary injunction fail on the merits have more moving pieces, and so I'm going to start there. First, a state does not violate the Americans with Disabilities Act when it makes an individualized determination that a particular Medicaid patient should be treated in a state-run facility, and Olmstead does not say otherwise. Now, the Americans with Disabilities Act and its associated regulations have been amended on a number of occasions since the Act was first passed in the early 1990s. However, throughout, it has been consistent that when a state chooses to provide a public benefit, it must ensure, and I quote, that its decisions are based on facts applicable to the individual and not based on presumptions about what a class of individuals with disabilities can or cannot do. That is what happened in this case. Ms. Harrison's treatment team submitted a plan of care, which Texas reviewed. Texas concluded that her medical records did not justify the level of care that she sought under an ordinary utilization review process in the Medicaid system. The state then, at her request, looked to see if she was qualified for separate state funding. It concluded that she was not. That satisfied the Americans with Disabilities Act. Now, Ms. Harrison claims that it violated the three-part test in just— You're saying an individual can't bring a claim like this? You have to show more class-wide discrimination? Yes, Your Honor. So, how do you deal with cases like the Seventh Circuit and Ratajkowski? Are you just saying those are wrong, or—? Not at all, Your Honor. So, Ratajkowski is factually distinguishable on a number of grounds. I thought it was one individual who wanted the home treatment. Yes, Your Honor, but the state of Illinois had made some changes to the actual program that were applicable to a broader class of people. In particular, it removed skilled nursing care at home, I believe, from its program that Mr. Ratajkowski had been receiving, and he was no longer receiving after that. There's no similar factual circumstance in this case. So, Ms. Harrison, however, says that Texas's actions nonetheless violate the three-part test of Justice Ginsburg's plurality of three and Part 3B of Olmstead. Now, there's a lot of confusion about what Olmstead does and does not require, because there's not been a great deal of discipline in applying United States v. Marx's rules about plurality opinions to Olmstead itself. Under this Court's view in Benitez and in the Jerome Caldera opinion that I cited in my letter last week, the plurality of three is not the law in this circuit because it was rejected by six justices. Nevertheless, no matter how you look at it, the state's conduct here satisfied the Americans with Disabilities Act. Looking first, so the only part of Olmstead that is the law is that an unjustified isolation violates the integration mandate as it existed. And the integration mandate is a specific regulatory requirement that an individual receive a public benefit with the most contact with non-disabled persons appropriate to her condition. While they dispute it in their appellate brief without citation to the record, the only record evidence is that Ms. Harrison will have a more integrated situation and with better care in the Denton State Supported Living Center. In particular, Dr. Galbraith, who is the medical director of that facility, examined her and examined the care that she was receiving and determined that she was told that she rarely left her room. The medical records that Nurse Igwe examined was that she rarely left her bed and that physical therapy that is required for her condition is unavailable in Berry. At the Denton facility, by contrast, there is an extensive physical therapy staff. She will have access to doctors of all specialties on campus, and to the extent her unique medical condition allow, she will have access to community outreach, including field trips. Was that expert evaluation by the state's doctor admitted by the district court for these purposes, or did she exclude that? The written testimony was admitted. The district court, page 518 of the record, refused to hear his oral testimony. As a result, the arguments in the appellee's brief that the statements are too conclusory are not well met. He would have been able to provide additional detail if the district court had allowed it, but she determined that she didn't need to hear any evidence because there was a violation of Olmstead, which we submit was an error. Beyond the integration mandate, if you look to what Justice Kennedy said in his concurrence, which we submit under Benitez, is the law of this circuit, then the integration mandate must be applied with due deference to the federalism concerns that are involved in a federal court micromanaging a state's policies on health care. Moreover, you look to see whether there are disparate treatment between classes of disabled persons. That has not been alleged in this case. But even if you disagree with me on all of that, she still hasn't satisfied the three-part test in Justice Ginsburg's plurality. Now, there's no dispute on the first element, specifically that Ms. Harrison and her family wish that she remains a Berry and Garland. There's actually no dispute on the second element either, specifically that a state treatment official has determined that services in the community are appropriate for her health care. Now, I say that's not disputed because it isn't. They dispute whether Justice Ginsburg meant what she said when she said a state treatment professional. Their view is to read that opinion to say any treatment professional. That is inconsistent with Justice Ginsburg's language. It is also inconsistent with the function of Medicaid, with how Medicaid itself functions. As this court recognized in Rush v. Parnum in 1980 and then just last month in the Palm Valley Health Center that I cited in my letter, there are instances where a treating physician orders care that is not necessary or that doesn't meet statutory definitions. Under those circumstances, it's perfectly ordinary for a state treatment professional to determine that the care was not required. That is what happened here, and she had the ability to challenge that conclusion, but it's not through an Olmstead claim. Now, the third element is whether the requested accommodation reflects a reasonable accommodation of her request or a fundamental alteration of the state's program. I mention those separately because the issue comes up twice. First, it comes up in her initial burden of proof to show that she's qualified for this program. It comes up again later in the proceedings, which we haven't gotten to yet, that the type of care that she would require as an affirmative defense is just too expensive or administratively difficult. In this instance, the type of care that Ms. Harrison is seeking would represent, she has not shown that the type of care that she is seeking would not be a fundamental alteration and therefore hasn't shown she's qualified. The HCS program that she seeks is designed... So you acknowledge the affirmative defense of fundamental alteration wasn't raised at this stage? Correct. But you're saying just to show she's qualified. She has to make an initial showing that she's qualified. So the ultimate burden of proof is on the state. We haven't gotten there yet. She never showed that she was qualified, in part because she was above the cap, but in part because the type of services she seeks are just not what HCS is about. HCS is about... When you say qualified, so looking again at the Seventh Circuit, and maybe you don't agree with it, but they viewed the qualified requirement as, is she qualified? Is there a community care center that would accept her, that would be suitable for her, and here there is. They don't view it as, is she qualified for the funds she's seeking? They viewed it as, is she qualified for the medical treatment? Some people just absolutely require institutionalization, and they wouldn't be qualified to be in a community setting. So I disagree with the Seventh Circuit's holding that is accurate, Your Honor. I also read the Seventh Circuit a little differently than you do. Mr. Ratajkowski was actually receiving the level of care that he had requested for years, up until the point the state denied it. The only difference was he reached the age of 21. He was receiving the type of care that he is asking for in their programs under CHIP, which is the child health care program. When he turned 21, he was no longer eligible, but it was the same care. Here, that's not what happened. Ms. Harrison's health changed, and as a result, the type of care she is seeking is no longer what the HCS program allows. How did her health change? I didn't see that in the briefs. So that is unclear from the medical records, which is part of the reason why the state decided that the type of care that she was seeking is not appropriate. She was originally staying at home from 2005 until 2016. Then she got a gastronomy tube installed, and she moved to Berry in 2017. We don't know what happened in April of 2017 that required the additional level of care, which is why the state requested her medical records on a number of occasions. But the type of 24-7, basically intensive care unit type care she seeks is not what the HCS program is about. Well, that's not what Berry is about either. Correct, Your Honor. No nursing home supplies 24-hour-a-day individualized nursing care that I'm aware of. That's right, Your Honor. I'm not sure if you meant to say Berry or Denton. Berry. So Berry is a group home, and a group home is not designed to provide the type of intensive care. Even if it were a nursing home, which I'm not clear on, nursing homes don't do that. Correct. The Denton facility, however, if she truly required that level of care, has an acute care center that provides care at basically an intensive care unit. There are five patients living there on ventilators, and there are some that live there permanently. So that is an option at Denton. It's not what Berry is about, and Medicaid doesn't require, and the ADA does not require that we turn Berry into an intensive care unit. Is there any kind of unit outside a state hospital, or maybe the state hasn't gotten to this point in litigation, but is there any kind of nursing home that ever supplies 24-hour LVN care to individual patients? Not that I'm aware of, and that's part of that. Let me put it this way. It's available, but you have to pay for it. Right. Yes, Your Honor. If you pay for it. Yes, but the Medicaid program does not require that it be provided, and turning to her due process and Medicaid fair hearing claims, that's precisely why she was not entitled to a Medicaid fair hearing. Her claim is not based on something that the Medicaid plan for Texas provides. It's based on the ADA. The Medicaid fair hearing requirement is tied to under 1396A.A.3. It is tied to what is required under the Texas Medicaid plan, so there's no violation of that rule here, nor is there a violation of the constitutional due process. To have a constitutional due process claim, you have two elements. First, a constitutionally protected liberty interest or property interest, which is usually defined by some area of positive law, and then you look at the procedures. Here, Medicaid does not provide it. Texas does not provide it. There's no source of law that gives her a right to the type of care, funded out-of-state dollars that she is seeking, and even if it did, that the process here satisfies constitutional due process. It's actually remarkably similar to the process that was approved in Matthews v. Eldredge itself, where the state notified Mr. Matthews that he did not qualify for the public benefit that he sought, and he was allowed to provide written evidence that he, in fact, did meet that requirement. The Supreme Court looked at that, noted that the evidence in the case in question involved medical records and medical testimony, which is not the sort of thing where a credibility determination is necessary so that an in-person hearing would really be useful to improve the quality of the decision-making process. Here, Ms. Harrison had the opportunity on multiple occasions to provide the state with medical records supporting the relief that she sought. They looked at it. They determined that that was not necessary, that the care that she sought was not necessary, and thus she did not meet the standards for the Texas General Appropriations Act. She complains that she was not allowed to seek appeal of that. However, that is no different than what would have happened if she had asked a federal agency to use its discretionary funds. Under the Lincoln case that we cite, there would be no judicial review of an administrative agency of a federal government, and that's not a violation of due process. We submit that that's a big reason why the court should have abstained. It would be anomalous to allow a federal court greater ability to micromanage how a state uses its funds than it allows for its own government. And for that reason, we respectfully request that you vacate the district court's decision and either instruct it to dismiss it or for further proceedings. Would you explain for me once more why Rataszewski is distinguishable in your view? There are a number of reasons why Rataszewski is distinguishable. First, the particular type of care that had been provided to the individual was something he had been receiving for a number of years, and then he became ineligible purely by the fact that he turned 21. Then, during the litigation, the state of Illinois actually altered its Medicaid program to exclude the type of care that it had originally been providing for Mr. Rataszewski for about a decade going forward. As a result, with those two factual circumstances, which are not at issue here, the Seventh Circuit concluded that the district court should not have decided the case on the pleadings. Well, did Illinois change its program to provide a cost cap similar to the Texas cost cap? I believe Illinois has a cost cap. The program, however, the change that was at issue in Rataszewski was not related to a cost cap. It was related to a change that removed the type of services he needed entirely. Thank you. All right. We have time for rebuttal. Mr. Whitburn. Thank you. May it please the Court, I'd like to respond to a few of the assertions made by counsel and a few of the questions by the Court as a preliminary matter. One, just to take the issue of whether an Olmstead claim may be made on behalf of an individual. Of course it may, and Judge Costa referenced the Rataszewski case, but one need look no further than Olmstead itself, because Olmstead was brought by Elsie and then E.W. intervened in the case. There's nothing in Olmstead that suggests that that was improper. Well, I think the point, the broader point is that Olmstead does not suggest that individuals should get special treatment if that comes at the expense of the entire state program. There certainly is no suggestion in Olmstead that an individual should receive special treatment, but the burden of proof is on the state to show that that would be special treatment. In other words, that there would be a fundamental alteration. And what that means is to indicate that assisting this individual would be at the expense of other individuals in the class. And as was in the case with Rataszewski, and this responds to another question that the court had. In Rataszewski, yes, Mr. Rataszewski had received care on the medically dependent children's waiver program until he was 21. Then he was placed on another waiver program, and the cost cap for that waiver program was about $5,000 per month. What the court says, even though his care would cost between $15,000 and $20,000 a month in his home, which was about three to four times what it would have cost, what the cost cap for the waiver program was, what the court said was, look, that's not the operative question. The operative question is, what would it cost? What would the state have to do to take care of him in an institution? The state has made no showing that it wouldn't have to provide that same level of care, 24-7 one-on-one licensed nursing care in the institution. And if that's the case, it's not treating him more specially, or it's not treating him differently than some other member of the class to say, well, look, if you're going to do the same thing in an institution anyway, if you've got to devote those resources in an institution anyway, then do it in the community. It's not prejudicing any other member of the disabled community, any other member of the community at large, to do that when you have that obligation under the Medicaid Act to provide him that level of care in the institution. It's just the location of the services, not the quantity. That's all we're asking for here. Talking about community placement, I mean, Olmstead, to me, the discrimination at its heart is about institutionalizing disabled people who could otherwise be involved, be in a community setting where they can interact with other people. Where is that happening here? I mean, it seems like, unfortunately, her medical state is such that wherever she is, she's not having that really involvement, that social interaction and community involvement, that to me is what Olmstead seems to be focused on. Olmstead is talking about the rights of individuals to have a certain level of community interaction, but community interaction is not necessarily about outings into downtown Fort Worth or whatnot. Community interaction is about being around your family, your friends, the people that can come see you. The placement that she is in right now. So how is the placement she's in now better than Denton for those purposes? I know it's closer to her family. She's closer to her family. She's with other people in a group home. The other thing is that she's in solitary confinement in a state hospital. Well, we don't know that. Well, excuse me, but the state hospital provides a menu of services, so in fact she may be seeing more people in the state hospital. Well, here's the thing about the state hospital, as it appears in the record. So the state hospital, all that the director of the Denton State School Support Living Center did is said, here are the services we have. But there are three critical admissions that both he and other state officials made in the course of this case, and that is that, one, they don't actually know. They have not even made a determination as to what level of care Ms. Harrison needs. Well, actually, one of their doctors did evaluate her, a lady who the state said had 30 years' experience with this kind of medical condition. Dr. Glenn, but Dr. Glenn never said exactly what level of care she needs. All Dr. Glenn said is she can, in principle, be taken. Right. But I thought the point we're arguing here is 24-hour licensed nursing care in a so-called integrated setting, right? So let's not worry about the other services that are available. The question is what's integrated and 24-hour nursing care. Right. And so the issue is to a certain extent. So in Olmstead, and this is just a preliminary point, but in Olmstead the analysis is not about a comparison between one particular institution versus one particular group home or one particular integrated setting. The issue in Olmstead is can you get out of an institution and then be in the community? And then once you're in the community, all of these Texas waiver services work the same way. I guess my question is how is her current placement different than the Denton institution? It seems to me in her state it's not that different than being institutionalized. It's different because she's with family, she's with her friends, she's with the other people that she chooses to be with in the institution. On those occasions when she can get out, she can get out in her own fashion, by her own choice, with her family's choice. I don't mean to be cruel, but what evidence is there of Ms. Harrison's wishes as opposed to her mother's declaration of her wishes? The mother is speaking for Ms. Harrison. She's the guardian. It's Ms. Harrison, and again, I'm not trying to be cruel. I'm just asking, does she communicate with a computer sort of situation? She does not. She does not, but her mother has a mechanism for communicating with her and understands her wishes, and her mother is expressing those wishes. Was that? Well, it's her wishes. I understand that, but I mean, what factual basis is there for that? Record on Appeal 194, which is the mother's affidavit that expresses what the family wants. And here's the thing. In terms of the community integration point, the issue, again, is can she be integrated into the community? If she can be integrated into the community, it's what she wants. Where does she want to go? What does the family want for her? If the state can't show that it would be a fundamental alteration for it to provide those community services, it's not for the state to dictate to her and to her family. Well, then why isn't she asking to be cared for at home again? Because at home, it's just her mother there, and her mother did care for her until February of 2017, but simply decided that she just couldn't do that anymore. The group home with friends and family there, that's the setting that is most like the community. And, again, in terms of what services – Excuse me. Is the Berry group home, is that a nursing home? How does it differ from a nursing home? A nursing home is a setting in which there are – it's a kind of institution. It's not a home in the community, in a neighborhood. A group home is literally a house in a neighborhood. It's literally in the community. Well, no wonder she has infection problems. I beg your pardon? I say no wonder she has infection problems in the group home. I was envisioning something more of a nursing home where they come around and they scrub it down all the time. Well, actually, she's with a nurse 24-7 right now. She's got a nurse there right now. And so they're certainly taking care of all these sorts of issues. But coming back to the issue of integration, it's important to recall with respect to the institution that although the staff member from the Denton State School listed services that the Denton State School provides, he never was able to indicate that they would provide any of those services to her because on record on PL906, he squarely indicates, look, not only do we not know exactly what level of care she's going to need, we don't even know how Denton State School is going to provide that level of care. In fact, we never know how Denton State School is going to provide that level of care until she's already in there. So this turns the Olmstead analysis completely on its head because you don't know. You can't even do the Olmstead analysis. You can't even ask yourself, okay, how much care does she need, where can we provide it, what location is best to provide this level of care. You can't even ask that question the way they did it here until after she's already in the institution, which completely violates Olmstead. Yes, Your Honor. I'm just surprised at that argument just because when the state undertakes to care for someone, Medicare is going to provide two-thirds of the funding. If the state were not able to provide adequate care, Medicare would jerk its funding from the state. So not only morally but legally and under the cooperative federalism envisioned by Medicare, the state is obliged to care for people adequately in institutional facilities. So arguing that they're not going to care for her, it seems to me, is extremely overbroad. And to the extent that that is what I interpreted as having said, that was not my argument, and I apologize for that. My argument is not that the institution would not take care of her, although there's evidence in the record to suggest that she would have difficulties in institution. My argument is rather this, that if you're going to make an argument that the Denton State School is actually more integrated or can provide more services, you have to know what level of care she's going to receive when she goes in. You have to know, okay, is she going to need the six hours of care that Ms. Igwe suggested she might? Well, then she's not even under the cost cap. Then you can provide that in the community. Is she going to need 12 hours of care? Well, if she's going to need 12 hours of care, how are you going to provide that? What level of services are appropriate for her? Are you going to be able to take her into the community if she's in Denton State School? You don't know. You can't answer those questions until after you have already figured out what level of care she needs, and the state never gave any indication as to how that could happen. That's why there had to be a due process proceeding as required by 42SC1396AA3 in the implementing regulations. Well, personally, I think the due process argument is your weakest argument altogether, but the rest of this has a lot to do with Radicevsky and the terms of the state statute. The statute has to be read in harmony with the ADA and the Rehabilitation Act as interpreted by Olmstead, and if you have a statute like 40 Texas Administrative Code 40.1 that says, well, if she can be taken care of in an institution, then we're not going to consider other funds, then that is the reverse of Olmstead. That is favoring institutionalization. And, in fact, in the very waiver application that the state of Texas submitted to the federal government, it anticipates exactly a case like this, and this is in record on Appeal 319 to 320, that the state of Texas says, okay, the federal government is asking, what do you do with somebody like Ms. Harrison? What do you do with somebody who was in the waiver program and then has a change in circumstances that caused that person to exceed the cost cap? What procedural safeguards do you put in place to make sure that there's no adverse impact on her? And then the state of Texas says, well, we do three things. We examine non-waiver sources of revenue, and there's been no indication in this case that the state of Texas ever did that. We consider institutionalization. Or, three, there's possible state revenue funds that we can use to cover the excess services over the cap. And then, right after saying that, the state of Texas says, if we're going to consider terminating her from the program, terminating her waiver services, then we provide her hearings under one Texas Administrative Code 357, Subchapter A. It never did that. But let me ask you the follow-on question, which is, undoubtedly, there are hundreds of individuals in Texas who share Ms. Harrison's tragic condition. And based on what you're saying, every one of those hundreds of individuals would have the right to go into a group home with 24-hour nursing care. Is that not correct? There have been only two cases that I know of. I don't care. I'm just asking you, if we rule in favor of Ms. Harrison, is that not the consequence of the law?  What is the consequence of the law is that the state of Texas has to provide a fair process for determining what the individual care needs are. So let me ask you then, suppose we do tell the state of Texas that it has to have this fair process, how can it come out otherwise than what you're arguing vis-a-vis the ADA and Olmstead? Because the state of Texas could show, for example, all of these things that we've been talking about today, for example. The state of Texas could show. Well, here in an institution, it's not actually going to cost as much as you're saying it's going to cost. It's not actually going to cost that much. Or the state of Texas could say, well, you know, actually the institutional setting is more integrated than any potential community setting, that really it's not appropriate for somebody in Ms. Harrison's condition to be outside of an institution. Isn't that an underlying assumption of what the district court held here? No, I don't think so, Your Honor. Because with respect to the integrated setting issue, what the district court held is, look, the only testimony about that issue at all came after litigation started, right before the preliminary injunction hearing. And you have people who are giving third-hand accounts of what somebody told them. But, you know, if they want to make that argument, if they want to make that suggestion, they can do that in the course of the litigation. But besides that, again, it turns on the issue of what Olmstead is all about. Olmstead is not a comparison between one institutional setting and one group home setting. It's about what can you do in the community versus what can you do in the institution. What can you do? Are you making the cost cap irrelevant? The cost cap is not irrelevant. But in this case, I think there are four ways of looking at the cost cap, one of which we've already talked about as far as Rataszewski. But the other three are this. One is that the Director of Utilization Review for HHSC specifically said, look, yes, there's a cost cap, but we don't – that's not a strict eligibility criterion, because we look at general revenue to see if we're going to provide services in the community anyway. And if we do, then we're still going to use the Medicaid funding. So the cost cap only becomes a hard cost cap if they don't use the other funding to supplement it. The second thing is, and you can look at the Steinwall versus Werner case that is cited in the state's briefing. It's the Seventh Circuit case. The Seventh Circuit in that case said, really, cost caps – you can't use a cost cap imposed by the state as a hard and fast eligibility criterion, because you have to look first at what it means to be a qualified individual with a disability. And that is dictated by 42 U.S.C. 12131 Part 2, which says that a qualified individual with a disability is someone who's eligible for the service at hand with or without a reasonable accommodation. So by necessity, you have to do the reasonable accommodation analysis first before you do the eligibility analysis. That's what the statute says. That's what Olmstead says. That's what Rataszewski says. So basically – okay, so basically you are saying the cost cap is irrelevant. It's irrelevant in the sense that it's never a hard and fast eligibility criterion, correct. But it's still relevant in the sense that the level of scrutiny has to be intensified once you get past the cost cap. The state still has to show that it's not going to spend the same dollars to serve her institution. You can't get past Olmstead just by state-imposed – No, but Olmstead is – I thought Olmstead was not as rigid as regards deinstitutionalization as your argument makes it because both the plurality in Section 3B and Justice Kennedy reemphasizes this, but the exceptions to institutionalization cannot swallow the fact that the state has to have institutions for some people. You are absolutely right, Your Honor. Both Justice Ginsburg in Part 3B and Justice Kennedy make that point. However, they are clear to make the point that it's the state's burden of proof to show that it would swallow that. And the Ninth Circuit is – When you're talking about mentally disabled people, and I know something about that from family experience, you are not talking about group homes that require extensive nursing care. The main object of those places is to make sure that the people stay on their medication, which they're otherwise not inclined to do and which they would be forced to have in the state hospital. So from that standpoint, Olmstead's discussion is really not even comparable to what we're dealing with here, which is severe medical disabilities as well as mental cognition. I think that Rataschewski makes clear that the Olmstead analysis still applies, that it would not be appropriate to say that there's a certain category of disabled individuals that sort of automatically deserve institutionalization. No, but I think you need to – no, I don't disagree with that. We're under Olmstead, but I'm not sure that you talk about institutionalization versus community placement in the same way with regard to this kind of condition. With respect to that kind of argument, I think that it would be the state's burden to show that it would not be – or that it would be a fundamental alteration. And Justice Ginsburg, in Part 3B of her opinion, says these are available defenses for the state to be able to show, but the state has to show it. And here there's just been no evidence. There's a lot – this is just a preliminary injunction. I have a question about your evidence showing that sending her to Denton would be more expensive than keeping Ms. Harrison at the Berry Group home. I assume that when you figure out what Denton costs, you're just taking a portion of the employees they have and maybe the air conditioning and the electric bill. I mean, is that – in other words, Berry is all out of pocket to the state, whereas isn't the Denton a lot of sunk costs? They're paying these salaries anyway, and if that's the case, how do we account for that difference? Well, the only – all we did, because the state never produced any cost evidence, which was their burden to produce, this is an affirmative defense for the state. So the only thing we did was to say, well, look, up until the preliminary injunction stage, the state never even said where they would put her. They never even gave us an institution that they would put her. Then when they finally said Denton State School, okay, so we look up and see what the state's own accounting for, what those costs are. And the state said, okay, well, it's going to cost $333,000 on average for an average individual at the state. Now, what that doesn't take into consideration is that Ms. Harrison is not an average individual. If she – like in Ratajkowski, if she requires 24-7 licensed nursing care, if she really does require that, then they're going to have to provide that in the institution as well. That's going to be dramatically greater than – It's not individualized. Right. Those are the numbers that we produced. But luckily this court doesn't have to go there because this is all for later in the litigation. Or better yet, if the state provides the required fair hearing, they can make these arguments at fair hearing. They can say, oh, well, you know, it doesn't really call – the kinds of things we're doing at the institution are really sunk costs. We can't get out of it. You know, you didn't argue that she had a – you're talking about due process. Where is her property or liberty interest? Well, the Medicaid statute already calls for due process. But we've already – you've already – I mean, the law here is that Medicaid doesn't have to pay a dime. Only the state has to pay a dime, and the state is going to – the law is discretionary, entirely discretionary. Well, I would disagree with that, Your Honor, because whether or not the federal government has to pay a dime is entirely contingent on what the state does. If the state says we're going to use general revenue funds to supplement the Medicaid funding, then the federal government is on the hook for the Medicaid funding. If the state says we're not going to use the – No, then you go to Medicaid and you try to deprive the state of all its Medicaid funds, but you don't – You just implied that your client had some kind of liberty of property interest, and I don't see it. Well, we've cited the Hamby v. Neal case out of the Sixth Circuit to indicate that a – someone who even has an anticipation, expectation of receiving Medicaid benefits has a legitimate property interest. But again, even without that, it goes to the Medicaid funds. If – and this is why the court said, both this court below and the district court in the Knowles case, that these funds are inextricably intertwined. Whether or not these Medicaid funds are spent on Ms. Harrison depends entirely – They're not Medicaid funds. They are the state's funds under Section 23. But there are Medicaid funds implicated. Well, only in the – never mind. We can agree to disagree, and your red light is off. Thank you. Thank you. Okay, Ms. Pettit. Thank you, and I'll just make a few quick points. First, the court – as Judge Costa and Judge Jones both pointed out, this is not really a case about discrimination in the sense – or integration, because unfortunately, and I also do not mean to sound cruel, but due to her conditions, Ms. Harrison's conditions, there is no functional difference between her being cared for at a group home and at a nursing home. And Olmstead does not require – and the Medicaid statute does not require one or the other. The state gets that discretion. But this is a group home. Well, she is currently at a group home, yes. Well, is there some kind of definition of what a group home is versus – I was just thinking in terms of the standards of hygiene and the fact that she supposedly has a compromised immune system and maybe a group home doesn't have the same required standards of hygiene as nursing homes. I am not an expert on the standards of hygiene for group homes, but you are very correct that a group home is not technically – is not really a medical facility, and she will receive better care, and that's part of what the state's treatment officials decided. She will receive better care at the Denton facility. So – and my colleague opposite criticized the state on a number of occasions for not determining precisely what care she needed. Now, part of that, and a large part of that, is that it changes over time, and it also changes – and what the Denton would have to do to provide that care also depends in part on what the Denton facility's current census and current patients look like. Judge Costa, you are absolutely right about what those numbers reflect. They reflect the total cost of the facility, the numbers that plaintiff's counsel cited, the total cost of the facility divided by the number of patients at the facility. So most of those costs come in the form of salaries for state employees. If there are nurses who are underutilized, those costs would not increase greatly if Ms. Harrison were to come. If they need to hire an additional nurse, it's different. But that is going – but what is required will depend both on her specific needs at the time and what else is going on at the facility. So – and going to the Medicaid fair hearing and why we think that the type of fair hearing that he is proposing is inappropriate is precisely because that type of question isn't what a Medicaid fair hearing is designed to answer. It's designed to answer what type of care this individual has or what type of care this individual needs. It would be a fundamental alteration of the entire fair hearing process if every single individual with Ms. Harrison's unfortunate health conditions were to come in and be able to offer evidence and require the state to produce individualized evidence about these types of sunk costs versus marginal costs versus here's what it takes. Olmstead doesn't require any of that. Neither does Medicaid. But that also turns to the point of what my colleague opposite said later in the proceeding. The district court isn't – this case isn't set on a discovery schedule to go to trial. The district court effectively granted Ms. Harrison the full relief she asked for on her due process claims in the form of its preliminary injunction. The preliminary injunction requires the state of Texas to provide the type of Medicaid fair hearing that she is entitled to after a trial on the merits in federal court. And at the time, we weren't even allowed to offer evidence to meet the preliminary injunction standard. And for that reason alone, remand is required so that a more tailored injunction can be entered. And finally, Judge Jones, you are absolutely right about the implications of ruling in favor of Ms. Harrison. If we will rule in favor of Ms. Harrison, the same standard must be applied to everybody else in the similarly situated circumstance because the ADA is fundamentally a discrimination – an anti-discrimination statute. So Texas will not be able to provide just to Ms. Harrison what she requests. And if this were to be provided to every single person in the state Medicaid system at the level she asks for, the system just couldn't stand it. And the federal law does not require it. What's the record reference for support for her need for 24-hour nursing care? So there are a number of – in terms of her support, she submitted four identical letters from different doctors from June of 2018. Well, did they explain why she needs 24-hour nursing care? They say in a conclusory fashion that without it, she has a risk of aspiration. But our view is that they do not adequately describe why she needs the 24-hour care that she seeks, and they are not supported by her records. She's not intubated? No, she's not intubated. She doesn't receive respiratory therapy. She's never had – at least at the time that we filed our brief, she's never had pneumonia. I don't know what her situation is now. There's no reason for her to have this level of care. Okay. Thank you, Your Honors. Thank you.